# CONNECTICUT STATE MEDICAL SOCIETY *v.* OXFORD HEALTH PLANS (CT), INC.
## (SC 17071)

Sullivan, C. J., and Norcott, Katz, Palmer and Zarella, Js.

Argued April 13, 2004—officially released January 11, 2005

*Edith M. Kallas*, pro hac vice, with whom were *Ilze C. Thielmann*, pro hac vice, *James E. Hartley, Jr.*, and, on the brief, *H.C. Kwak*, for the appellant (plaintiff).

*Joseph L. Clasen*, with whom, on the brief, was *Thomas J. Donlon*, for the appellee (defendant).

*Opinion*

PALMER, J. The plaintiff, Connecticut State Medical Society, commenced this action against the defendant, Oxford Health Plans (CT), Inc., seeking injunctive relief for the defendant's alleged violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The trial court granted the defendant's motion to strike the plaintiff's second amended complaint, concluding that the plaintiff lacked standing because the harm allegedly suffered by the plaintiff was derivative, indirect and too remote to be actionable. The plaintiff filed this appeal,[1] claiming that the trial court improperly had concluded that it lacked standing. We affirm the judgment of the trial court.

The following undisputed facts and procedural history are relevant to our resolution of this appeal. The plaintiff is a federation of eight county medical associa-

---

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

tions with a total membership of more than 7000 physicians.[2] The defendant is a managed care organization that provides medical insurance coverage within Connecticut. The defendant contracts with physicians to provide services to its subscribers. All contracts between the defendant and physicians contain a provision requiring arbitration of all disputes arising under the contract as a condition precedent to bringing an action in court.

The plaintiff brought this action, both in its individual capacity and on behalf of its member physicians, alleging that the defendant had violated CUTPA. The plaintiff claimed, in essence, that the defendant had engaged in an unfair and deceptive scheme to avoid making timely and complete payments to the plaintiff's member physicians. The plaintiff alleged that the defendant had effectuated this scheme through, inter alia, the systematic denial of bona fide requests by the plaintiff's members for payment for medical services rendered to the defendant's subscribers. In addition to the harm that the defendant's allegedly unfair and deceptive practices had caused the plaintiff's members, the plaintiff further alleged that the "[d]efendant's unfair and deceptive course of conduct and business practices have . . . injured [the plaintiff] in its own right as [the plaintiff] has been, and continues to be, frustrated by [the] defendant's practices in its efforts to achieve [the plaintiff's] purpose and [the plaintiff] has been required to devote

---

[2] According to the complaint, the plaintiff's "philosophy and purpose . . . [are] to promote the highest standards of medical care in the state of Connecticut, to work to preserve the integrity and independence of physicians, and to support the sanctity of the physician-patient relationship for the benefit of the public by, among other things, facilitating and assisting its physician members in providing top quality care to their patients, providing them with a unified voice and enabling them to take concerted action on behalf of their profession and of their patients, and acting and advocating on their behalf to preserve the ability, independence and freedom of physicians to render the best possible care to every patient."

significant resources to dealing with issues concerning [the] defendant's unfair practices." The plaintiff sought injunctive relief only.[3]

The defendant filed a motion to dismiss, claiming that the plaintiff lacked standing to bring the action, either: (1) on behalf of its physician members, because those physicians were contractually obligated to arbitrate their disputes with the defendant before commencing an action in court; or (2) on its own behalf, because the harm that the plaintiff allegedly had suffered was derivative and indirect. The trial court granted the motion to dismiss with respect to the plaintiff's representational claim,[4] but denied the motion with respect to the claim brought by the plaintiff on its

[3] Specifically, the plaintiff sought "permanent injunctive relief prohibiting, restraining, and enjoining [the] defendant" from engaging in the allegedly unfair and deceptive practices identified in the complaint.

[4] In dismissing the plaintiff's representational claim, the trial court relied on *Connecticut Associated Builders & Contractors* v. *Hartford*, 251 Conn. 169, 185, 740 A.2d 813 (1999), in which we concluded that an association has standing to bring an action on behalf of its members if it meets the test for representational standing articulated in *Hunt* v. *Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977). Under that test, an association must show that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." (Internal quotation marks omitted.) *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 185. The trial court concluded that the plaintiff had failed to satisfy the first prong of the test. The trial court concluded: "It is illogical to assume that the representative or agent of a party that has agreed to arbitration may enforce that agreement but not itself be subject to the duty to arbitrate. An association whose members cannot, for such procedural reasons, bring suit on their own behalf, has no standing to bring the same suit on [behalf of] its members . . . . To hold otherwise would be to defeat the enforceability of arbitration agreements, as a party that had agreed to arbitrate could sidestep that obligation merely by having a surrogate, whether an association or an assignee, bring the suit on its behalf, depriving the other party to the contract of the benefit of the provisions of the contract." The plaintiff has not appealed from the trial court's dismissal of its representational claim and, consequently, that ruling is not before us.

own behalf. In denying that portion of the defendant's motion that sought dismissal of the claim raised by the plaintiff in its own right, the trial court concluded that the plaintiff "sufficiently [had] alleged a direct injury to itself to have standing to pursue that injury." The court further explained: "The pleading rules applicable to the [defendant's] motion are those supplied . . . by the Connecticut Practice Book. Under those provisions, if the [defendant] had desired a more specific statement of the claims of direct injury to the [plaintiff], it could have filed a request to revise. [When] no such request has been filed . . . the court construes the allegations of the complaint in the manner most favorable to the pleader, and there is no basis for dismissal for failure to plead to a level of detail that the [defendant] has not requested." (Citations omitted.)

The defendant then filed a request to revise, seeking, inter alia, an enumeration by the plaintiff of the manner in which the defendant's alleged actions had caused harm to the plaintiff directly. The plaintiff thereafter filed a second amended complaint in which it alleged, inter alia: "[The defendant's] wrongful conduct causes direct injury to [the plaintiff] in that [the] defendant's conduct has frustrated [the plaintiff] in its efforts to achieve its organizational purpose, and [the plaintiff] has been required to devote significant resources to assist its physician members in an effort to counteract the harmful impact of [the] defendant's unfair and deceptive acts and practices . . . . Over at least the past five years, [the plaintiff] has expended significant time and monetary resources on the following activities:

"[1] Communicating with and counseling [the plaintiff's] physicians who provide care to [the defendant's] enrollees regarding [the defendant's] unfair practices . . . .

"[2] Communicating with county medical associations in the state of Connecticut, as well as the American

Medical Association, regarding [the defendant's] unfair and deceptive practices . . . in an effort to devise ways to try and counteract the adverse impact that such practices have on [member] physicians.

"[3] Communicating with the [state department of insurance] and the [state office of the attorney general] regarding [the defendant's] and other managed care organizations' use of the unfair and deceptive practices . . . and the adverse impact [that] these practices have on [member] physicians.

"[4] Communicating with state legislators regarding [the defendant's] and other managed care organizations' use of the unfair and deceptive practices . . . and the impact of such practices on [member] physicians.

"[5] Retaining outside counsel to assist [the plaintiff] in its efforts to obtain legislation to address the adverse impact that [the defendant's] and other managed care organizations' unfair and deceptive practices . . . have on [member] physicians."

The plaintiff further alleged that, "[i]n addition to the foregoing, [the plaintiff] has been injured by the impact that [the defendant's] wrongful conduct has on [the plaintiff's] ability to obtain money to fund its operations. In this regard, a substantial portion of [the plaintiff's] budget comes from dues paid by its members. Because of [the defendant's] and other managed care organizations' failure to provide adequate reimbursement to [member] physicians to cover the costs of delivering health care, for several years, [the plaintiff] determined that it would not be able to increase the dues [that] it charges its members, even though [the plaintiff] has been operating at a deficit."

The defendant filed a motion to strike the plaintiff's second amended complaint, claiming, inter alia, that the plaintiff lacked standing because its "alleged injury

[was] too remote and derivative of the alleged injury of its member physicians . . . ."[5] The trial court granted the defendant's motion to strike, relying primarily on *Ganim* v. *Smith & Wesson Corp.*, 258 Conn. 313, 780 A.2d 98 (2001), in which this court held that the plaintiffs lacked standing to assert a CUTPA claim against the defendants. Id., 373. We concluded that CUTPA claims, "like other statutory and common-law claims, [are] subject to the remoteness doctrine as a limitation on standing."[6] Id.; see also *Vacco* v. *Microsoft Corp.*, 260 Conn. 59, 89, 793 A.2d 1048 (2002) (CUTPA incorporates general principle that plaintiffs with indirect injuries lack standing to sue). On appeal, the plaintiff contends that the trial court misapplied our holding in *Ganim* and, as a consequence, improperly granted the defendant's motion to strike. We disagree and, accordingly, affirm the judgment of the trial court.

We note, preliminarily, the applicable standard of review. "If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause. . . . A determination regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find sup-

[5] The defendant also moved to strike the plaintiff's second amended complaint on the ground that the plaintiff's claim was legally insufficient under CUTPA because the plaintiff: (1) had failed to allege facts establishing the existence of either a "consumer, competitor or other business relationship" between the plaintiff and the defendant; and (2) had not suffered any "ascertainable loss" as a result of its alleged injury but, rather, merely had elected to reallocate its resources. Because the trial court granted the defendant's motion to strike on standing grounds, that court did not reach these alternative claims.

[6] The trial court also relied on *Vacco* v. *Microsoft Corp.*, 260 Conn. 59, 87–90, 793 A.2d 1048 (2002), in which this court, inter alia, reaffirmed the standing analysis that we had employed in *Ganim*. As the trial court noted, both *Ganim* and *Vacco* were decided after the trial court had ruled on the defendant's motion to dismiss.

port in the facts that appear in the record." (Internal quotation marks omitted.) *Cadle Co.* v. *D'Addario*, 268 Conn. 441, 446, 844 A.2d 836 (2004).

Our review of the plaintiff's claim is guided by our recent decision in *Ganim* v. *Smith & Wesson Corp.*, supra, 258 Conn. 313. In *Ganim*, we were required to determine whether the plaintiffs, the city of Bridgeport (city) and its mayor, had standing to bring an action under CUTPA, other statutes and the common law against various firearms manufacturers, trade associations and retail sellers for the costs incurred by the city as a result of gun violence. Id., 315–16. We concluded that the plaintiffs in *Ganim* lacked standing because the harms that they alleged were too indirect and remote, and were derivative of the injuries of others. Id., 325. In so concluding, we reviewed certain fundamental principles of standing, explaining that, "[i]t is axiomatic that a party must have standing to assert a claim in order for the court to have subject matter jurisdiction over the claim. . . . Our standing jurisprudence consistently has embodied the notion that there must be a colorable claim of a direct injury to the plaintiff, in an individual or representative capacity. . . .

"The requirement of directness between the injuries claimed by the plaintiff and the conduct of the defendant also is expressed, in our standing jurisprudence, by the focus on whether the plaintiff is the proper party to assert the claim at issue. In order for a plaintiff to have standing, it must be a proper party to request adjudication of the issues. . . .

"Thus, to state these basic propositions another way, if the injuries claimed by the plaintiff are remote, indirect or derivative with respect to the defendant's conduct, the plaintiff is not the proper party to assert them and lacks standing to do so. [When], for example, the harms asserted to have been suffered directly by a plain-

tiff are in reality derivative of injuries to a third party, the injuries are not direct but are indirect, and the plaintiff has no standing to assert them. *Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.*, 191 F.3d 229, 238–39 (2d Cir. 1999), cert. denied, 528 U.S. 1080, 120 S. Ct. 799, 145 L. Ed. 2d 673 (2000).''[7] (Citations omitted; internal quotation marks omitted.) *Ganim* v. *Smith & Wesson Corp.*, supra, 258 Conn. 346–48.

We thereafter adopted "the analysis of standing employed by the United States Court of Appeals for the Second Circuit in *Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.*, supra, 191 F.3d 235, drawn from the decision of the United States Supreme Court in *Holmes* v. *Securities Investor Protection Corp.*, [503 U.S. 258, 268, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992)].

---

[7] As we further explained, "in federal standing jurisprudence, the courts have considered the questions of proximate cause—which we ordinarily analyze under the concept of duty—and standing as part and parcel of the same inquiry. Here we use proximate cause to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts. At bottom, the notion of proximate cause reflects ideas of *what justice demands, or of what is administratively possible and convenient*. [W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 41, p. 264]. Accordingly, among the many shapes this concept took at common law, see [*Associated General Contractors of California, Inc.* v. *California State Council of Carpenters*, 459 U.S. 519, 532–33, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)], was a demand for some direct relation between the injury asserted and the injurious conduct alleged. Thus, a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover. See, e.g., 1 J. Sutherland, Law of Damages [(1882) pp. 55–56]. *Holmes* v. *Securities Investor Protection Corp.*, 503 U.S. 258, 268–69, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992) . . . .

"In everyday terms, the concept might be explained as follows: Because the consequences of an act go endlessly forward in time and its causes stretch back to the dawn of human history, proximate cause is used essentially as a legal tool for limiting a wrongdoer's liability only to those harms that have a reasonable connection to his actions. The law has wisely determined that it is futile to trace the consequences of a wrongdoer's action to their ultimate end, if end there is. *Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.*, supra, 191 F. 3d 235." (Citations omitted; internal quotation marks omitted.) *Ganim* v. *Smith & Wesson Corp.*, supra, 258 Conn. 349–51.

In *Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.*, supra, 232–33, the plaintiff labor union health and welfare funds sued the defendant major tobacco companies alleging a conspiracy to deceive the public generally, and the plaintiffs specifically, regarding the health risks of smoking in order to shift the health related costs of smoking to the plaintiffs. The [Second Circuit] Court of Appeals held that the financial harms alleged by the plaintiffs were remote, derivative and indirect and, therefore, that the plaintiffs lacked standing to sue. Id., 239.

"The Court of Appeals in *Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.*, supra, 191 F.3d 236–37, stated: As Justice Holmes writing for the [United States Supreme] Court observed in [*Southern Pacific Co.*] v. *Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533, 38 S. Ct. 186, 62 L. Ed. 451 (1918), [t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step. Accord *Holmes* [v. *Securities Investor Protection Corp.*, supra, 503 U.S. 271–72] (quoting [*Associated General Contractors of California, Inc.* v. *California State Council of Carpenters*, 459 U.S. 519, 534, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)]. For that reason, [when] a plaintiff complains of injuries that are wholly derivative of harm to a third party, [the] plaintiff's injuries are generally deemed indirect and as a consequence too remote, as a matter of law, to support recovery. See *Holmes* [v. *Securities Investor Protection Corp.*, supra, 268–69]. At the same time, the [United States] Supreme Court noted the impossibility of articulating a black-letter rule capable of dictating a result in every case. See [id., 272 n.20]. Accordingly, it identified three policy factors to guide courts in their application of the general principle that plaintiffs with indirect injuries lack standing to sue . . . . See [id., 269–70]. First, the more indirect an injury is, the more difficult it becomes to determine the

amount of [the] plaintiff's damages attributable to the wrongdoing as opposed to other, independent factors. Second, recognizing claims by the indirectly injured would require courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, in order to avoid the risk of multiple recoveries. Third, struggling with the first two problems is unnecessary [when] there are directly injured parties who can remedy the harm without these attendant problems. See [id.]." (Internal quotation marks omitted.) *Ganim* v. *Smith & Wesson Corp.*, supra, 258 Conn. 351–53. Finally, we expressly held that these principles are applicable to claims brought under CUTPA. Id., 373.

Upon application of these principles, the overarching component of which is that derivative, or indirect, harms are not actionable, we conclude that the plaintiff lacked standing to sue the defendant. There can be no dispute that *all* of the injuries that the plaintiff allegedly suffered derive solely and exclusively from the harm allegedly visited upon the plaintiff's members by the defendant. In other words, *none* of the harm that the plaintiff allegedly suffered as a result of the defendant's conduct is direct. In such circumstances, the presumption against standing is strong, at least in the absence of compelling countervailing considerations.

The plaintiff has identified no such considerations in the present case. On the contrary, any possible doubt as to whether the plaintiff properly may pursue this action against the defendant is dispelled by the fact that those directly injured by the defendant's allegedly improper conduct, namely, the plaintiff's members, are themselves free to seek redress against the defendant. Presumably, those physicians first will be required to arbitrate any claims they may have against the defendant, but that is only because they had contracted with the defendant to do so. Indeed, permitting the plaintiff

to bring this action would be to countenance an end run around those arbitration provisions, a result that is incompatible with the express agreement of the parties to those contracts. See id., 359 (unfair to defendant to accord standing to plaintiff who alleges indirect or derivative harm when action brought by plaintiff who alleges direct harm would be subject to one or more special defenses on basis of latter plaintiff's conduct).

The plaintiff seeks to invoke the three policy factors that we adopted in *Ganim* "to guide courts in their application of the general principle that plaintiffs with indirect injuries lack standing to sue"; (internal quotation marks omitted) id., 353, quoting *Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.*, supra, 191 F.3d 236; claiming that the first two of those factors support its standing argument. With respect to the first such factor, that is, the difficulty in determining "the amount of the plaintiff's damages attributable to the wrongdoing as opposed to other, independent factors"; (internal quotation marks omitted) *Ganim* v. *Smith & Wesson Corp.*, supra, 258 Conn. 353; the plaintiff maintains that this factor supports its claim of standing because the harm that the plaintiff alleges, although derivative, nevertheless is attributable to the defendant's allegedly improper conduct and not to any other independent source, and, in any event, because the plaintiff seeks injunctive relief only, the amount of damages simply is not an issue. With respect to the second factor, that is, the potential need for the court to "adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, in order to avoid the risk of multiple recoveries"; (internal quotation marks omitted) id.; the plaintiff notes that, because it seeks injunctive relief only, the apportionment of damages, like the amount of damages, is not at issue and, consequently, this con-

sideration, the plaintiff maintains, also supports its claim of standing.

We reject the plaintiff's argument because it is based on a misperception of the principles that we articulated in *Ganim*. As we explained in *Ganim*, as a general rule, a plaintiff lacks standing unless the harm alleged is direct rather than derivative or indirect. Id., 347–48 (when "the harms asserted to have been suffered directly by a plaintiff are in reality derivative of injuries to a third party, the injuries are not direct but are indirect, and the plaintiff has no standing to assert them"); id., 352 (when "a plaintiff complains of injuries that are wholly derivative of harm to a third party, [the] plaintiff's injuries are generally deemed indirect and as a consequence too remote, as a matter of law, to support recovery" [internal quotation marks omitted]). Recognizing that the application of this general rule to a particular factual scenario may not always yield a ready or obvious answer to the question of standing, we, like other courts, have endorsed the use of the three factor policy analysis set forth in *Ganim*. See id., 353. As the third factor of that analytical model makes clear, however, applying the first two considerations "is unnecessary whe[n] there are directly injured parties who can remedy the harm . . . ." (Internal quotation marks omitted.) Id. In the present case, the plaintiff's member physicians were directly injured by the defendant's allegedly improper conduct, and there is nothing to prevent one or more of them from remedying any such harm. Consequently, the plaintiff's member physicians, and not the plaintiff itself, are proper parties to an action seeking redress for the defendant's allegedly improper conduct.[8] Thus, the trial court properly con-

[8] We are not persuaded, therefore, by the plaintiff's assertion that its claim of standing is stronger because it seeks injunctive relief only. As a general matter, a plaintiff's standing to sue is dependent not on the nature of the remedy that the plaintiff seeks but on the existence of an actionable injury. The fact that injunctive relief may be a suitable remedy for a particular harm does not alter the fundamental principle that the party seeking redress

cluded that the plaintiff lacks standing to bring this action.

The judgment is affirmed.

In this opinion the other justices concurred.

for its own injury must demonstrate that that injury is direct as opposed to derivative or indirect.